**CONTINENTAL OIL CO. v. JONES,**
Collector of Internal Revenue.

No. 1938.

Circuit Court of Appeals, Tenth Circuit.
June 26, 1940.

558

PHILLIPS, Circuit Judge, dissenting in part.

———◆———

D. A. Richardson, of Oklahoma City, Okl. (A. L. Hull, of Ponca City, Okl., and Hayes, Richardson, Shartel & Gilliland, of Oklahoma City, Okl., on the brief), for appellant.

Milford S. Zimmerman, Sp. Asst. to Atty. Gen. (Charles E. Dierker, U. S. Atty., of Oklahoma City, Okl., Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and J. L. Monarch, Sp. Assts. to Atty. Gen., on the brief), for appellee.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

This is a suit at law instituted by Continental Oil Company, a corporation organized under the laws of Delaware, hereinafter called Continental, against the Collector of Internal Revenue for the District of Oklahoma, to recover excise taxes in the sum of $699,131.82, plus interest, exacted and paid under protest on (1) 33,693,179 gallons of gasoline and 5,185,633¼ gallons of lubricating oil transferred on June 20, 1932, to Continental Oil Company, a corporation organized under the laws of Nevada, hereinafter called Nevada, (2) 18,407,760 gallons of gasoline transferred on the same day to Conoco Oil Company, a corporation organized under the laws of Delaware, hereinafter called Conoco, and (3) 8,307,600 gallons of gasoline transferred to Conoco on June 14, 1933; the tax being exacted upon the subsequent sale of such gasoline and oil to others. Trial by jury was waived and the cause submitted to the court. The collector prevailed, 26 F.Supp. 694, and Continental appealed.

Section 601(c) of the Revenue Act of 1932, 47 Stat. 169, 259, 26 U.S.C.A.Int.Rev. Acts, page 604, imposed an excise tax of four cents per gallon on lubricating oil sold in the United States by the manufacturer or producer, or imported into the United States, to be paid by such manufacturer or producer, or importer; section 617(a), 26 U.S.C.A.Int.Rev.Acts, page 616, imposed a like tax of one cent per gallon on gasoline sold by the producer or importer; section 617(c) defined the term "producer" to include a refiner, compounder, or blender, and a dealer selling gasoline exclusively to producers of gasoline, as well as a producer; and section 629, 26 U.S.C.A.Int.Rev.Acts, page 624, provided that Title IV, which included sections 601 and 617, should take effect on the fifteenth day after the date of the enactment of the act. The act was ap-

proved June 6, and therefore sections 601 and 617 became effective on June 21. And section 211 of the Act of June 16, 1933, 48 Stat. 195, provided that as of the day following the date of the enactment of the act, the tax on gasoline should be increased to one and one-half cents per gallon.

The record is long, but the disputed questions of fact are not in broad compass. Continental was engaged on an extensive scale in the production, refinement and sale of gasoline and lubricating oil at wholesale and retail, and had many wholly or partially owned subsidiary corporations. Nevada and Conoco were wholly owned subsidiaries. Nevada was incorporated in 1929 for the primary purpose of protecting the name of Continental in certain states where Continental was not qualified to do business. Its authorized capital stock consisted of twenty shares of $100 each, but only five shares with a par value of $500 had been issued, and they were owned by Continental. Prior to June 20, 1932, it had never owned any gasoline or lubricating oil, and it did not have any facilities for marketing gasoline or oil. Aside from earned surplus slightly in excess of $25,000, its assets consisted of capital stock in other subsidiary companies which it had acquired on open account from Continental, and its function had been confined to that of a small holding company, organized to protect the Continental name in certain states. Conoco was also organized in 1929, because another company had pre-empted the name of Continental in Illinois, Indiana, and Kentucky. It did business in those states and in Michigan, Minnesota, Ohio, and Wisconsin. It sold to jobbers, retailers and consumers, and had storage facilities at about seventy-five places where it received tank car shipments; it had offices in Chicago from which its business and marketing operations were conducted; it owned real and personal property in the states in which it did business; it owned service stations, trucks and other equipment, all bearing its name; it had bank accounts into which money derived from sales was deposited; it transferred money to Continental at fairly regular intervals of two or three times a week; it paid the salaries of its employees and the taxes on its properties from its Chicago offices; its accounts receivable ledgers, bills payable ledgers, merchandise ledgers, and personnel records were kept in Chicago; but its general policies were determined by its officers and directors in Ponca City, its general books were kept in Ponca City, the same employees who conducted the accounting department of Continental performed the physical work of keeping its accounting records, and it reimbursed Continental for its portion of their salaries and administrative expense in the doing of that work; and the trade name "Conoco", as applied to their products, was used by both Continental and Conoco. Continental subsequently acquired the right to use its name in Illinois, Indiana and Kentucky, and Conoco was dissolved in 1935. The manager of Conoco became manager of Continental in Chicago, there was little or no change in personnel or facilities, and the operations were substantially the same. From its incorporation to its dissolution, all of the capital stock of Conoco was owned by Continental. The officers and directors of the three companies were practically the same; they had the same treasurer and the same general counsel; and the main offices of all three were in the office building of Continental in Ponca City, Oklahoma. Great Lakes Pipe Line Company, hereinafter referred to as Great Lakes, was a common carrier engaged in the main in serving its proprietary companies in the transportation and storage of gasoline products. Continental, Mid-Continent Petroleum Corporation, Phillips Petroleum Company, Barnsdall Corporation, Skelly Oil Company, Pure Oil Company, The Texas Company, and Sinclair Refining Company owned its capital stock. On June 21, 1932, Continental owned about 31.2 per cent of such stock; the president of Continental was also president of Great Lakes; the vice-president and general manager of Great Lakes had been connected with a subsidiary of Continental; and the secretary and treasurer of Great Lakes had been an employee of Continental for a short time.

It was discovered that by the terms of sections 601 and 617 of the act a tax was levied upon sales of gasoline and lubricating oil made by producing dealers but that no tax was levied upon sales made by nonproducing dealers. The Assistant Secretary of the Treasury recommended that the sections be amended before their effective date in such manner that the tax would be levied alike on both classes of dealers. After discussion among its officials and with executives of one or two other major producing companies in the Mid-Continent area, Continental determined to and did lend aid in the effort being exerted to secure passage of such an amendment. A joint resolution designed to effect the de-

sired change passed the House of Representatives on June 16, but on June 20 an effort to secure its passage in the Senate failed. From June 6 to June 20, the officers of Continental, Nevada and Conoco conducted negotiations respecting the sale of gasoline and lubricating oil. Growing out of such negotiations a special meeting of the directors of Nevada was held on June 20, the day on which the joint resolution failed of passage in the Senate, and the day before sections 601 and 617 of the act were to become effective, at which a resolution was adopted authorizing the officers of the corporation to purchase from Continental stocks of gasoline and lubricating oil estimated at 33,500,000 and 5,000,000 gallons respectively, and further authorizing such officers to enter into an agreement with Continental for the use of its facilities in marketing such gasoline and oil, and to pay therefor a price per gallon of the products marketed that in their judgment would be fair and equitable. Following that meeting, and on the same day, Continental executed and delivered to Nevada a bill of sale reciting that for one dollar and other good and valuable consideration, it conveyed the gasoline and oil described in detail in the schedule or schedules thereto attached. No schedule was attached at that time because an inventory of the stocks in bulk plants, warehouses and service stations was not available. But it was subsequently attached, and it showed 33,693,179 gallons of gasoline and 5,185,653.25 gallons of oil. Contemporaneously with the execution of the bill of sale, Continental and Nevada entered into a written contract which recited that Continental agreed to permit Nevada to use the facilities, service stations and employees then owned, operated and employed by Continental for the sale and distribution of such gasoline and oil, and to handle and collect the accounts arising out of and incident to such sale, and that Nevada agreed to pay Continental for the use of such facilities and employees the sum of four and three-fourths cents per gallon for all gasoline and oil sold and distributed. By amended agreement entered into the next day, the amount to be paid Continental was increased to six cents per gallon, the increase being intended to cover overhead expenses and depreciation. Upon the execution and delivery of the bill of sale Nevada was credited on the books of Continental with the inventories and was charged with the purchase price thereof, and Continental was charged with such inventories on the books of Nevada. No provision was made for immediate payment, in whole or in part. The gasoline and oil were subsequently sold through the facilities of Continental, the last being sold in January, 1933; Continental collected for them as they were sold, and placed the money in its account in bank; by book entries the obligation of Nevada to Continental for such gasoline and oil was liquidated; and a net profit to Nevada of $250,000 was reflected on the books. As to Nevada the transaction was unprecedented in character and amount, nothing of the kind having previously taken place.

Likewise growing out of the negotiations referred to, Continental also executed a bill of sale on June 20 conveying to Conoco, 18,407,760 gallons of gasoline then in the terminals of Great Lakes for the recited consideration of $1,243,303.90. A receipt signed by an officer of Conoco was attached to the bill of sale. No provision was made for the immediate payment of any part of the purchase price; the matter was handled on open account with appropriate book entries; and the purchase price was paid out of the proceeds as the gasoline was sold. The board of directors of Conoco did not meet or authorize the transaction. Its manager was not consulted in advance and knew nothing of it until after its completion. Continental promptly advised Great Lakes of the transactions. Great Lakes replied that they were intercompany transactions, that they had no effect upon its accounting, and that it would continue to render its analyses of tenders as usual leaving it to Continental to make the segregation within its organization. And Great Lakes did not make any change in its records due to such transactions. Prior to the transfer Conoco did not own any gasoline in the pipe line or terminals of Great Lakes. It ordered its gasoline from Great Lakes, and the orders were filled with gasoline of Continental in the terminals of Great Lakes. To save time it was arranged for Conoco to place orders direct with Great Lakes, but they were filled with gasoline belonging to Continental and were later confirmed. After the transfer Conoco obtained its gasoline through the same routine as before, the only difference being in the book entries of Continental and Conoco. Conoco's normal requirements of gasoline were from three to four million gallons per month, and the stock thus transferred was exhausted by sale and distribution in January, 1933. But not all of it was used in supplying demands of Conoco. More than

700,000 gallons were used in supplying the demands of Continental or Nevada. That gasoline was shipped by Great Lakes at the direction of Continental. Entries appropriate to reflect sales from Conoco to Continental or Nevada, as the case might be, and then to the ultimate purchasers, were entered upon the books of the companies concerned. These shipping orders were headed by Continental's name and signed with Continental's name and by its employees. And sometimes a tank car of gasoline was recorded on the books of the companies concerned, one-half from Conoco stock and one-half from Continental stock. Subsequent to the transfers, different parts of the gasoline were mixed at the direction of Continental and without authority from Conoco or Nevada. After June 20, the retail prices on sales of gasoline were increased one cent per gallon. On June 14, 1933, three days before section 211, supra, increasing the tax on gasoline to one and one-half cents per gallon, went into effect, Continental executed a bill of sale conveying 8,307,600 gallons of gasoline to Conoco. The circumstances leading up to the execution of that instrument were substantially comparable to those leading to the execution of the earlier bill of sale to the same company, and on the day the increase in tax became effective the price of gasoline was increased a further one-half cent per gallon.

After investigation, the Commissioner of Internal Revenue held that each of the corporations involved was a separate entity, that the transactions were made at arm's length through proper contractual relations, that title to the gasoline and oil actually passed prior to the effective date of the imposition of the tax, that there was no element of fraud or any violation of law when the transfers were made, that the sales were bona fide sales, and that no tax was due. Later the matter was reopened, and upon further consideration, the Commissioner determined that the whole plan surrounding the transaction was executed for the sole purpose of escaping liability for the taxes, that since Nevada and Conoco were wholly owned subsidiaries under the complete control of Continental, they were in substance its selling agents, and that sales made through them were considered sales by Continental. Still later, the Commissioner recognized the validity of the sales to Conoco to the extent of its then normal requirements, but held that the sales in excess of such requirements were in-

effective in respect of the liability of Continental for the excise taxes due thereon. The taxes were exacted and paid under protest, claims for refund were rejected, and this suit followed.

The court made extended findings of fact and conclusions of law. Among others, it was found and concluded that neither Nevada nor Conoco was in any financial condition to purchase the inventories transferred to them; that after the transfers made in 1932, the liability of each to Continental exceeded its assets; that the motive of Continental in effecting the transfers was to escape payment of the taxes; that Continental retained and exercised complete control of the inventories transferred on its books; that the transactions were not had at "arm's length"; that the transfers were not valid and bona fide; that Continental used its subsidiaries as mere instrumentalities for the purpose of attempting to avoid an imminent tax; and that for the purpose of liability for the tax, Continental was still the owner of the gasoline and oil.

■ The principal contention to which most of the argument is directed is whether the transfers were effective to avoid the taxes assessed against Continental upon the subsequent sale of the gasoline and oil. It has been held that a taxpayer has the right to decrease in amount that which otherwise would be his taxes, or to avoid them in toto, provided the method employed to accomplish that end is permitted by law. Superior Oil Co. v. Mississippi, 280 U.S. 390, 50 S.Ct. 169, 74 L.Ed. 504; Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355; Johnson v. Commissioner, 2 Cir., 86 F.2d 710; Morsman v. Commissioner, 8 Cir., 90 F.2d 18, 113 A.L.R. 441, certiorari denied, 302 U.S. 701, 58 S.Ct. 20, 82 L.Ed. 542; Jones v. Page, 5 Cir., 102 F.2d 144, certiorari denied, 308 U.S. 562, 60 S.Ct. 93, 84 L.Ed. ——; Helvering v. Johnson, 8 Cir., 104 F.2d 140, affirmed by an equally divided court, 308 U.S. 523, 60 S.Ct. 293, 84 L.Ed. ——. But where evasion or avoidance of taxes is the intent and purpose of a transaction the forms used for its accomplishment will be scrutinized. Morsman v. Commissioner, supra.

■ Ordinarily a corporation and its single stockholder or multiple stockholders are deemed separate entities, and generally that separateness is preserved when dealing with matters relating to taxes. Klein v. Board of Supervisors, 282 U.S. 19, 51 S.Ct.

15, 75 L.Ed. 140, 73 A.L.R. 679; Dalton v. Bowers, 287 U.S. 404, 53 S.Ct. 205, 77 L.Ed. 389; Burnet v. Clark, 287 U.S. 410, 53 S.Ct. 207, 77 L.Ed. 397; Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399; New Colonial Ice Co. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348; Bancker v. Commissioner, 5 Cir., 76 F.2d 1, certiorari denied, 296 U.S. 603, 56 S.Ct. 119, 80 L.Ed. 428; Menihan v. Commissioner, 2 Cir., 79 F.2d 304, certiorari denied, 296 U.S. 651, 56 S. Ct. 368, 80 L.Ed. 463; Commissioner v. Eldridge, 9 Cir., 79 F.2d 629, 102 A.L.R. 500; Webber v. Knox, 8 Cir., 97 F.2d 921. But extraordinary circumstances sometimes require the disregard of such separateness of entity in the solution of tax problems. Southern Pacific Co. v. Lowe, 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142; Gulf Oil Corporation v. Lewellyn, 248 U.S. 71, 39 S.Ct. 35, 63 L.Ed. 133; Burnet v. Commonwealth Improvement Co., supra; Gregory v. Helvering, supra; Commissioner v. Eldridge, supra.

▮ The mere fact that a parent corporation owns all of the stock in a subsidiary, standing alone and without more, is not enough to warrant the disregard of their separate juridical entities. It usually is where such ownership of stock is used and employed not for the purpose of participating in the affairs of the subsidiary in the usual and normal manner but for the purpose of dominating and controlling it in such manner and to such extent that it becomes the mere agency or instrumentality of the parent (United States v. Lehigh Valley R. R. Co., 220 U.S. 257, 31 S.Ct. 387, 55 L.Ed. 458; United States v. Delaware, Lackawanna & Western R. R. Co., 238 U.S. 516, 35 S.Ct. 873, 59 L.Ed. 1438; Chicago, M. & St. Paul Ry. Co. v. Minneapolis Civic Association, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229; United States v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760), or where to maintain separate corporate entity would work fraud or injustice (Taylor v. Standard Gas Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669) that they are treated as merged. And that general rule has application in a case involving tax problems. Munson S. S. Line v. Commissioner 2 Cir., 77 F.2d 849.

▮ Whether the separateness of corporate identity should be maintained or disregarded in a case involving tax problems depends upon the facts and circumstances in the particular case. Southern Pacific Co. v. Lowe, supra. Here the act was about to become effective. It imposed a tax upon sales made by producing dealers but not upon those made by nonproducing dealers. Continental was a producing dealer and therefore would become liable for sales made by it, but the subsidiaries were not producing dealers and therefore would not be liable for sales made by them. On the threshold of the effective date of the act, Continental transferred to the subsidiaries substantially all of the gasoline and oil which it owned—more than fifty million gallons and more than five million gallons respectively without payment or provision for immediate payment of any part of the purchase price. Neither was in financial position to make such an enormous purchase. The property was not segregated, moved or changed in location. Nevada had never engaged in the business of buying or selling either gasoline or oil and had no facilities for doing so. The inventories transferred to it were sold and distributed through the facilities of Continental, the money received and retained by Continental and applied on the open account liability of Nevada. Nevada never had any physical possession of the inventories and had nothing to do by way of direction, supervision or otherwise with their sale and distribution. Conoco was organized and did business solely because Continental could not engage in business in its corporate name in certain states. The officers of the two corporations were substantially the same; the principal offices of Conoco were in the office building of Continental at Ponca City; some of its books and records were kept there; and in many instances the same employees did work upon the books of both. It submitted quarterly budgets in advance to Continental. It acquired all of its gasoline and oil from Continental and remitted the money received from the sale thereof to Continental at regular intervals of two or three times per week. The transactions between Continental and Conoco in respect to the transfer of gasoline and oil and remitting for them were conducted by book entries. These facts and circumstances, and others previously detailed and not repeated here, and the reasonable inferences to be drawn from them, go far beyond mere ownership of all of the stock in the two subsidiaries and participation in their affairs in the usual and normal manner of a stockholder. They show domination, control, and participation in affairs of such kind and to such degree as to bring the case

well within the principles announced in two quite recent cases. In Griffiths v. Commissioner, 308 U.S. 355, 60 S.Ct. 277, 278, 84 L.Ed. 319, the taxpayer in 1926 paid one Lay $100,000 for certain stock. The investment turned out badly, and in 1931 a deductible loss of $92,500 was allowed resulting from the taxpayer's sale of the stock to a family corporation. Later, in 1932, the taxpayer learned that he had been defrauded in the purchase of the stock, and negotiations were begun for the settlement of his claim against Lay. In connection with such negotiations, the taxpayer devised a scheme under which he was to re-acquire the stock and convey it to a newly created corporation wholly owned by him; the corporation, in turn, was to transfer it back to Lay for $100,000 to be paid by him; and the corporation was to pay that sum to the taxpayer in forty annual installments, with interest on the deferred payments. The taxpayer re-acquired the stock and transferred it to Lay without disclosing the existence of the new corporation, gave Lay a personal release of all claims against him, received the $100,000, and turned it over to the corporation. The Commissioner determined that the taxpayer having been allowed a deduction for loss attributable to the stock purchased from Lay, and having been recouped for such loss through settlement of the claim, was subject to tax for the amount of the settlement in 1933. In sustaining that action on the part of the Commissioner, the court said: "We cannot too often reiterate that 'taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid.' Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916. And it makes no difference that such 'command' may be exercised through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency, Cf. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L. Ed. 596, 97 A.L.R. 1355. 'A given result at the end of a straight path,' this court said in Minnesota Tea Co. v. Helvering, 302 U. S. 609, 613, 58 S.Ct. 393, 395, 82 L.Ed. 474, 'is not made a different result because reached by following a devious path.' Legislative words are not inert, and derive vitality from the obvious purposes at which they are aimed, particularly in the provisions of a tax law like those governing installment sales in § 44 of the Revenue Act of 1932 [26 U.S.C.A.Int.Rev.Acts, page 497]. Taxes cannot be escaped 'by anticipatory arrangements and contracts however skillfully devised * * * by which the fruits are attributed to a different tree from that on which they grew.' Lucas v. Earl, 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731. What Lay gave Griffiths in reality got, and on that he must be taxed."

In Higgins v. Smith, 308 U.S. 473, 60 S. Ct. 355, 357, 84 L.Ed. 406, the taxpayer wholly owned a corporation. Its officers and directors were subordinate to him. Its transactions were conducted under his direction and were confined largely to buying securities from him or selling them to him, but they kept completely separate accounts. The mutual transactions in buying and selling securities, and receiving dividends, resulted as of December 29, 1932, in an indebtedness from the taxpayer to the corporation in the sum of $70,000. On that date, as a partial payment on such indebtedness, the taxpayer sold to the corporation certain stock at market. It had cost him more than the price charged to the corporation, and in computing his net taxable gain for that year he treated the difference as a loss. The Commissioner disapproved that treatment of the item, the tax was paid under protest, and the suit was brought to recover the amount. The case was tried to a jury, and a verdict was returned against the taxpayer. In holding that the taxpayer was not entitled to recover, the court took occasion to say:

"It is clear an actual corporation existed. Numerous transactions were carried on by it over a period of years. It paid taxes, state and national, franchise and income. But the existence of an actual corporation is only one incident necessary to complete an actual sale to it under the revenue act. Title, we shall assume, passed to Innisfail but the taxpayer retained the control. Through the corporate forms he might manipulate as he chose the exercise of shareholder's rights in the various corporations, issuers of the securities, and command the disposition of the securities themselves. There is not enough of substance in such a sale finally to determine a loss. * * *

"On the other hand, the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed

for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation. It is command of income and its benefits which marks the real owner of property."

The transfers in question here were not tainted with fraud, and they were not otherwise illegal. But it is clear beyond doubt that the generating motive for the making of them was tax consequences. That is so plain that elaboration is unnecessary. The facts and circumstances preceding, attending and following the transactions lead to the conclusion that in respect of liability for excise tax, the subsequent sales of the gasoline and oil were the equivalent of sales by Continental in its own right. Griffiths v. Commissioner, supra; Higgins v. Smith, supra.

■ The court found that the gasoline transferred in June, 1932, was mixed or blended by Great Lakes at the direction of Continental, in accordance with the specifications of the marketing committee of the proprietary companies of Great Lakes, that is to say 400 end point and 420 end point gasoline were blended, resulting in a new grade of gasoline. This finding is assailed on the ground that the issue was not tried, but was reserved for subsequent trial and determination in the event the court should find that the sales were valid and effective; that it was agreed that Continental should introduce no evidence upon it unless and until the court should find that the sales were valid, and relying upon such agreement Continental did not do so; and that in such circumstances the making of the finding and the rendition of the judgment thereon denied Continental a hearing upon the issue and operated to deprive it of its property without due process of law in violation of the Fifth Amendment to the Constitution of the United States. As previously stated, it is provided in section 617(c) (1) of the act that the term "producer" shall include a blender. By answer the collector pleaded that after the alleged transfers, Continental directed the activities in connection with the handling, treatment and sale of the gasoline and oil, that the completely owned subsidiaries proceeded to blend such gasoline and compound such oil, and therefore became producers within the meaning of sections 601 and 617 and hence liable for the tax upon the sale of the blended or compounded product, and that for such reason defendant had a valid recoupment or setoff against the claim in suit sufficient in amount to extinguish it. It was made clear throughout the trial that the evidence relating to the mixing after the transfers was offered solely and exclusively for the purpose of showing ownership and control by Continental, not blending within the meaning of the statute, and that the issue of blending was reserved for subsequent hearing and determination in the event the court should determine that the transfers were valid and effective. Clearly understanding that, the court stated at one juncture that the evidence would not be considered upon the question of blending, and also stated at the conclusion of all the evidence that the right would be preserved to open the case for the purpose of submitting proof upon that question if the situation should develop in which either party desired to do so. Standing alone, the finding in question may be susceptible of the interpretation that the court treated the mixing of the gasoline as constituting blending within the meaning of the statute. But the statements and announcements of the court, the findings of fact and conclusions of law, as a whole, the written opinion, and other parts of the record, all considered together, make it plain that the case was not decided upon that theory. The basis of the decision was that the transfers did not absolve Continental of liability for the tax upon the subsequent sale of the gasoline and oil. The entire record negates any foundation upon which it could be concluded that the court rested its decision and judgment upon the theory that the mixing constituted blending which rendered Continental liable for the tax.

■ Certain findings of fact, and certain conclusions of law said to be in reality findings of fact, are challenged on the ground that they are not supported by evidence but are contrary to the evidence, and that the court erred in making them. The findings are long, and it would not serve any useful purpose to delineate them, consider them separately, or discuss at length the evidence relating to them. It may be said in summary that in our opinion the evidence and the inferences which the court was reasonably warranted in drawing from it constitute substantial support for the findings, and that they are not clearly erroneous. It follows that they must stand on

appeal, Rule of Civil Procedure 52(a), 28 U.S.C.A. following section 723.

Other findings of fact are attacked on the ground that they are immaterial to any issue in the case; one on the ground that a portion is erroneous and the remainder is immaterial; one conclusion of law, said to be in reality a finding of fact, on the ground that it is erroneous and immaterial; and another conclusion of law, likewise said to be a finding of fact, on the ground that a portion is contrary to the evidence and the remainder is immaterial. It is self-evident that findings which are concededly immaterial do not constitute prejudicial error. And it may be said in respect to the findings questioned on other grounds that we see no reason to disturb them.

The judgment is affirmed.

PHILLIPS, Circuit Judge (dissenting in part).

In this opinion, Continental Oil Company will be referred to as Continental, Continental Oil Company of Nevada as Nevada, and Conoco Oil Company as Conoco.

Nevada was organized to protect the name, Continental Oil Company. At the time the purported sale was made to it in June, 1932, it was not engaged in the sale of gasoline, oil, or other petroleum products and had no facilities for so doing. The purported sale to it could have had but one purpose, the avoidance of the excise tax. Hence, I agree with the conclusions of the majority with respect to the purported sale to Nevada. See Higgins v. Smith, 308 U.S. 473, 476, 60 S.Ct. 355, 84 L.Ed. 406.

It is my opinion, however, that there were substantial and material differences between the sales to Conoco and the sale to Nevada. Conoco was organized in 1929 under the laws of Delaware. At the time of its organization, another Continental Oil Company was chartered in Illinois, Indiana, and Kentucky. This prevented Continental from doing business in its own name in those three states. Conoco was organized to carry on the marketing of petroleum products produced and manufactured by Continental in the states of Illinois, Indiana, and Kentucky and in other states in the Great Lakes Region. Conoco maintained offices in Chicago from which its business was transacted. It had about fifty employees. From the date of its incorporation, it owned real and personal property in its own name in the states in which it did business, consisting of service stations, trucks, and other equipment, all bearing its name. Its general policies were determined by its officers and directors in Ponca City, Oklahoma, but its marketing operations were conducted from its offices in Chicago. It paid the wages and salaries of its employees and the taxes on its property from its Chicago offices. It kept separate books relating to its individual corporate affairs. Its accounts receivable ledgers, personnel records, bills payable ledgers, and merchandise ledgers were kept in the Chicago offices. It sold to jobbers, retailers, and consumers and had storage facilities at about seventy-five points where it received tank car shipments. It had its own bank account in Chicago which was maintained from funds derived from its sales. Excess funds over current requirements were transferred to Continental in payment for petroleum products purchased. Its business was, and for three years had been, the purchase and sale of oil and gasoline as a dealer. It had previously purchased practically all its requirements from Continental.

The excise tax on sales of gasoline was imposed only on sales by an importer or producer.

Other dealers in gasoline, oil, and other petroleum products who were not importers or producers and who were selling in competition with Conoco, purchased between June 6, 1932, and June 20, 1932, large stocks of gasoline, ranging from two to four times as much as they had theretofore purchased in a like period, or thereafter purchased in a like period. In order for Conoco to compete with them on an equal cost basis, it was necessary for it to likewise purchase, prior to June 21, 1932, stocks of gasoline largely in excess of its current demands. A like situation existed when the sale was made to Conoco in 1933. The amount purchased was approximately Conoco's requirements for a sixty-day period. The entire stock so purchased was disposed of within a period of six months. The proceeds of the sales by Conoco were deposited in its bank account in Chicago.

The Commissioner found that the sales to Conoco were free from fraud and ruled that they were not taxable. This was in keeping with the settled practice of the Treasury Department to impose excise taxes

on intercompany transactions, including sales from parent to subsidiary. [1]

Later the Commissioner modified his original ruling and held that Continental was liable for the tax to the extent the sales, to Conoco exceeded its normal demands of three to ,four million gallons of gasoline per month.

In Higgins v. Smith, 308 U.S. 473, 476, 60 S.Ct. 355, 357, 84 L.Ed. 406, the court said:

"The Government urges that the principle underlying Gregory v. Helvering finds expression in the rule calling for a realistic approach to tax situations. As so broad and unchallenged a principle furnishes only a general direction, it is of little value in the solution of tax problems. If, on the other hand, the Gregory case is viewed as a precedent for the disregard of a transfer of assets *without a business purpose but soley to reduce tax liability,* it gives support to the natural conclusion that transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration." (Italics mine.)

Here the sales to .Conoco served a proper and legitimate business purpose. By purchasing in excess of its normal demands, Conoco placed itself in a position to meet, on an equal basis, its competitors who had made like purchases. Had it not done so,

it would have had to purchase gasoline after June 21, 1932, at an increased cost of one cent per gallon and after June 17, 1933, at an increased cost of one-half cent per gallon, and sell it in competition with other dealers who had purchased at a lesser cost before such increases became effective. That the selling price of gasoline was increased the amount of the tax when the tax became effective is not material. It was the cost, not the selling price, that would have affected Conoco.

The undisputed testimony was that Conoco did not fix the selling price other than to follow the price fixed by the Standard Oil Company of Indiana, which was the dominant marketeer in Conoco territory, and the price at which Conoco sold was fixed by its own officers and directors and not by Continental.

It is true of the approximate 18,000,000 gallons of gasoline sold to Conoco, it resold aproximately 704,000 gallons to Continental, but these transfers were effected by actual sales and Continental either paid or credited Conoco therefor and when Continental sold the gasoline which it repurchased, it paid the tax thereon.

For the reasons indicated, it is my opinion that the Continental was entitled to judgment for the excise tax paid on the gasoline which it sold to Conoco.

---

[1] See Pickwick Corporation v. Welch, D.C.Cal., 21 F.Supp. 664, 670.

Sec. 619(b) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Code, § 3441, in part reads:

"(b) If an article is—

\* \* \*

"(3) sold (otherwise than through an arm's length transaction) at less than the fair market price;
the tax under this title [chapter] shall (if based on the price for which the article is sold) be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Commissioner."

The Treasury Department, in a ruling construing Title 4 of the Revenue Act of 1932, said:

"That Congress had full knowledge of the conditions existing with reference to affiliated corporate groups is further established by the fact that in the income tax law special provisions appear relating to such groups, under which they are authorized to file consolidated returns. The general laws recognize corporations as separate entities and, in the absence of special legislation, such as is incorporated in the income tax provisions of the Act relating to affiliated groups, each corporation, as a separate legal entity, must file a separate return for the purpose of the excise tax." (Internal Revenue Cumulative Bulletin XI-2, pp. 513, 514.)

Art. 15 of Regulations 46 provides:

"Where, through the existence of special arrangements between a manufacturer and a purchaser (as in the case of intercompany transfers at cost or at a fictitious price), the price for which articles are sold by the manufacturer does not reflect a fair market price, the sale is regarded as one made 'otherwise than through an arm's-length transaction.' In such cases the tax shall be computed upon a fair market price, which, under the Act, the Commissioner is empowered to determine."