UNITED STATES of America

v.

MANOR CARE, INC.

Civ. No. Y–79–712.

United States District Court,
D. Maryland.

May 28, 1980.

David Dart Queen, Asst. U.S. Atty., Baltimore, Md. and Francis G. Hertz, Washington D.C., for plaintiff

Robert E. Scott, Jr., Baltimore, Md., and John J. Yurow, Washington, D.C., for defendant.

JOSEPH H. YOUNG, District Judge.

The United States of America seeks the return of a tax refund erroneously given to the defendant, Manor Care, Inc. Most of the facts have been stipulated by the parties. On April 11, testimony of one witness was presented by the defendant, and the Court heard argument from the parties. Set forth below are the Court's findings of fact and conclusion of law, in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

Manor Care, Inc. (Manor) owns subsidiary corporations engaged in a variety of businesses, including nursing homes. For the tax year ending May 31, 1969 it filed a consolidated federal tax return, which is permitted under § 1501 of the Internal Revenue Code ("the Code"). In the 1970's, it decided to expand the nursing home operations, and new corporations were formed for this purpose.

Charles Manor, Inc. (Charles), and Colton Manor, Inc., (Colton), were incorporated as Maryland corporations on February 24, 1970 for the purpose of operating two new homes in Towson and Hagerstown, respectively. These two corporations were owned by the Stewall Corporation (Stewall), which in turn was owned by Manor.

A consolidated return was filed for the year ending May 31, 1971, to which the two new corporations consented to being included, as required under § 1501. Deductions were taken by Manor on this return for certain "pre-opening" expenses of the nurs-

ing home (i. e., expenses incurred before they received licenses). It is these deductions which are in question.

An Internal Revenue Service (IRS) agent disallowed the deductions. After an administrative appeal was denied, Manor paid $44,399.43 plus $13,950.44 in interest, and then filed a claim for a refund in 1976. In 1977, according to the IRS, the government "by mistake" told Manor that its claim was being accepted, and "erroneously" sent a refund check in the following amount:

| | | |
|---|---|---|
| $44,399.43 | – | original deficiency |
| 13,950.44 | – | interest paid on deficiency |
| 3,014.29 | – | interest paid to Manor on refund |
| 13.21 | – | abatement of penalty |
| $61,377.37 | | |

The government is now suing for the return of this "erroneous refund."

Stewall bought the property for the Charles nursing home in 1968 and arranged for financing with the Equitable Trust Company and the Prudential Insurance Company. In 1970, Stewall assigned the Prudential mortgage commitment to Charles, and transferred the Charles Street property to the subsidiary. In June, 1970, Charles began to draw on the Equitable loan.

An application for a state nursing home license was filed in June, 1970, in the name of Charles, and the license was received on July 22, 1970. No care was provided before receipt of the license.

In September, 1970, Charles assumed the indebtedness of Stewall. Charles now owns the land and building, and took depreciation on it for the year ending May 31, 1971. Charles insured itself with the Hartford Insurance Group, and also applied for a zoning variance in its own name.

Charles has its own employer number, has filed quarterly employer's returns reporting wages paid, and has executed agreements relating to civil rights compliance in its own name.

Two checking accounts are in the name of Charles. One is a transfer account into which all receipts are deposited, and transferred weekly to Manor. The other account is an operating account out of which inci-

dental expenses are paid by the home administrator. This account is replenished periodically by Manor. Most expenses, including wages, are paid directly by Manor.

In the tax return in question, Manor indicates that it was paid $63,743 by Charles. The IRS contends this is pursuant to a management fee agreement executed between Manor and its then existing nursing homes in 1968, and approved by the Manor board of directors in 1969. Manor acknowledges the existence of the agreement, but says it was never followed. Rather, it says, Manor allocated an amount equal to the total expenses among the nursing homes on the basis of a bed/month per home formula. As a result, Manor states that it had no net income or loss as a separate corporation for nursing home activities for that year.

According to Manor, the transfer of receipts and payment of expenses by Manor was accurately reflected in each company's books. As of May 31, 1971, the accounts showed both Charles and Colton in debt to Manor.

The Colton home was developed in a similar manner. Stewall initially purchased the property, while Manor arranged for financing. In 1970, Stewall deeded the property to Colton. In this case, as with Charles, construction was well underway at the time of the transfer. Colton received its license on January 27, 1971 and began to provide care thereafter. Like Charles, Colton owned its land and building, and took depreciation on it in the year ending May 31, 1971. Colton is operated much like Charles, as described above.

Manor runs these corporations in the way it would run unincorporated divisions. The directors and officers are identical for Manor and its subsidiaries. Manor has five departments which oversee the running of all of its subsidiaries: Development, Construction, Purchasing, Operations, and Finance. The directors and officers oversee all of the subsidiary corporations, although there is a Nursing Home Administrator responsible for the day-to-day operations of each home.

The expenses in question were for wages, training, utilities, advertising, promotion, and consumable supplies. No tangible assets were involved except the consumables. All of the expenses are said by Manor to be recurrent, the type incurred week in and week out while in operation. During argument, the government stated it did not contest this characterization of the nature of the expenses. Accordingly, the Court finds the Manor characterization to be correct. Manor points out that training expenses are of short-term value because the average employee lasts less than a year. Likewise, promotion expenses are apparently necessary on a continuing basis since the average patient stays less than a year.

The period covered in each case was from the beginning of the tax year through the date the license was received. For Charles, the deduction was in the amount of $46,-256.09, for Colton, it was $46,984.52.

### CONCLUSIONS OF LAW

The IRS argues that these expenses could not be deducted by Manor since the corporations were all separate taxable entities. It argues further that Colton and Charles could not deduct the expenses because they could not be said to be "carrying on" a business under § 162 of the Code before they received state licenses.

#### A. Were the Corporations Separately Taxable?

A number of Supreme Court cases hold clearly that where a taxpayer has decided to form separate corporations for business reasons, they are separate taxable entities.

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.

*Moline Properties v. Commissioner*, 319 U.S. 436, 439, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499 (1943). Several years later, the Court made the following statement, relying on *Moline* :

> . . . we have held that a corporation formed or operated for business purposes must share the tax burden despite substantial identity, in a practical operation, with its owner. Complete ownership of the corporation, and the control primarily dependent upon such ownership—the important ingredients of the *Southern Pacific* [*v. Lowe*, 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142] case—are no longer of significance in determining taxability.

*National Carbide Corp. v. Commissioner*, 336 U.S. 422, 429, 69 S.Ct. 726, 730, 93 L.Ed. 799 (1949). It is clear in this case that the subsidiaries were formed *and* operated for business purposes.

The Supreme Court specifically found that the amount of control exercised by the parent was irrelevant:

> We can see no significance, therefore, in findings of fact such as, "The Airco board held regular meetings and exercised complete domination and control over the business of Airco and each of the petitioners," and "The chairman, vice chairman, and president of Airco were in charge of the administration and management of the activities of each petitioner and carried out the policies and directives with respect to each petitioner as promulgated by the Airco board."

*National Carbide, supra*, at 433, 69 S.Ct. at 732. The IRS acknowledges that corporate forms are sometimes ignored in tax questions, but argues that such cases are limited to exceptions such as those cited in *Moline* :

> A particular legislative purpose, such as the development of the merchant marine, whatever the corporate device for ownership, may call for the disregarding of the separate entity, *Munson S.S. Line v. Commissioner*, 77 F.2d 849 (CCA) as may the necessity of striking down frauds on the tax statute. *Continental Oil Co. v. Jones*, 113 F.2d 557, (10 Cir.) In general, in matters relating to the revenue, the cor-

porate form may be disregarded where it is a sham or unreal. In such situations the form is a bald and mischievous fiction. *Higgins v. Smith*, 308 U.S. 473, 477–478, 60 S.Ct. 355, 357–358, 84 L.Ed. 406; *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596.

*Moline, supra*, 319 U.S. at 439, 63 S.Ct. at 1134. Case law supports the government's position that reallocation of income and expenses between affiliated corporations is a tool available only to the government, and not to the taxpayer.

Manor has cited three cases to support its theory that corporations operating as one should be taxed as one. The first two involved reallocation of income and expenses between affiliated corporations under § 482 of the Code, which allows such reallocation where the taxpayers would otherwise be able to evade taxes. *Hamburgers, York Road, Inc. v. Commissioner*, 41 T.C. 821 (1964); *Marc's Big Boy-Prospect, Inc. v. Commissioner*, 52 T.C. 1073 (1969), *aff'd*, 452 F.2d 137 (7th Cir. 1971). These cases are distinguishable from the case now under consideration because the Commissioner was acting under the authority given him in § 482. There is no comparable section allowing a taxpayer to reallocate. The third case cited is the only case known to this Court in which a taxpayer was allowed to ignore corporate forms for tax purposes. *Baltimore Aircoil Co. v. U. S.*, 333 F.Supp. 705 (D.Md.1971). That case, however, was remanded by the Fourth Circuit; judgment was then vacated by stipulation of the parties so the opinion has no precedential value. Furthermore, the conclusion in *Baltimore Aircoil* is against the weight of the law.

Manor's final argument for ignoring corporate forms for tax purposes is based on the filing of consolidated tax returns under §§ 1501 *et seq.* Under § 1502, the Secretary of the Treasury is given broad authority to issue regulations to determine the tax liability of affiliated corporations filing under these sections. Manor acknowledges that the general rules under these regulations are:

. . . (1) that consolidated taxable income be determined by taking into account the separate taxable income of each member of the group and (2) that the separate taxable income of a member of a group be computed in accordance with the provisions covering the determination of taxable income of separate corporations.

Defendant's Memorandum in Opposition to Motion to Exclude Testimony at 3. Under these general rules, the expenses in question could only be deducted by the individual corporations, if at all.

Manor points out, however, that there are exceptions to these general rules for computing the consolidated income tax, *see* 26 CFR § 1.1502–12, and suggests that the purpose of these exceptions is to facilitate computation of the actual income of the "business unit" in question, and that in keeping with this goal, the Court should allow the affiliated corporations to compute their income as one business suit. Manor in effect wants this Court to create a new exception to the general rules whenever an affiliated group can show it operates as one business unit. There is no authority for doing so. §§ 1501 *et seq.* do not require such a result. The language of § 1502 clearly delegates broad authority to the Secretary. In exercising that authority, regulations have been issued governing the computation of consolidated income. These regulations do not include any provision that would allow the affiliated corporations in question to be taxed as a single entity, and the Court declines to create any such rule. Accordingly, Charles and Colton must be taxed as separate entities, and the expenses in question can only be deducted by them, if at all.[1]

1. As indicated by the findings of fact, the defendant presented evidence supporting its contention that the corporations were operated as a single business. This evidence was introduced over the government's objection that it was irrelevant. At the hearing, the government moved to introduce a deposition to counter some of defendant's evidence on this point. The motion was denied by the Court. Since the hearing, the government has renewed this

### B. Are the "Pre-Opening" Expenses Deductible by Charles and Colton as Separate Corporations?

If the expenses in question are deductible by the individual corporations, it is under § 162(a) of the Code, which provides:

There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year *in carrying on* any trade or business . . .

(Emphasis added). The IRS argument is that, as a matter of law, the subsidiaries were not "carrying on" a business because they had not yet obtained a license. Manor, on the other hand, contends that the determination of the date a business begins operations is a question of fact for each case.

The IRS relies primarily on *Richmond Television Corporation v. U. S.*, 345 F.2d 901 (4th Cir. 1965), *vac. & rem. on other issues*, 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143 (1965). That case involved one of a number of competitors for a television license from the FCC. The eventual recipient of the license tried to deduct expenses incurred in training employees before the license was granted. The IRS disallowed the deduction, and the Fourth Circuit supported that position. The court began its discussion by stating that "the issue therefore is at what point of time did its business begin, and whether at this doubtful, prefatory stage it was carrying on a business." *Id.* at 905. Most of the cases the court considered in answering this question were other cases dealing with radio and television stations, and expenses incurred before a license was obtained. The one case not involving an FCC license was *Cohn v. U. S.*, 57–1 U.S.T. Cases 9456 (D.C.W.D.Tenn.1957), *aff'd on other grounds*, 259 F.2d 371 (6th Cir. 1958), cited in *Richmond* at 906–907. In that case, involving a flight training school, the "taxpayers had spent large sums [before opening] in training instructors, for legal fees and expenses connected with the negotiation of the lease for the airfield, and in

dedication ceremonies." *Richmond* at 907. It was held that these were non-recurrent, capital expenditures.

Applying these cases to the facts before it, the Fourth Circuit stated:

The uniform teaching of these several cases is that, even though a taxpayer has made a firm decision to enter into business and over a considerable period of time spent money in preparation for entering that business, he still has not "engaged in carrying on any trade or business" within the intendment of section 162(a) until such time as the business has begun to function as a going concern and performed those activities for which it was organized.

Applying this rule, we are of the view that there was no basis in the evidence for a charge permitting the jury to find that the taxpayer was in business during the period in question. We are of the opinion, therefore, that the District Court was in error in failing to hold as a matter of law that Richmond Television was not in business until 1956, when it obtained the license and began broadcasting. Until then there was no certainty that it would obtain a license, or that it would ever go on the air. Since all of the expenditures underlying the disputed deductions were made before the license was issued and broadcasting commenced, they are "pre-operating expenses," not deductible under section 162(a).

*Id.* at 907. While the language of *Richmond* is broad, it would be reading too much into the case to conclude that, as a matter of law, no company can deduct expenses incurred before it obtains a required license. The Court of Appeals stated that the issue of when a business actually begins is "usually a factual issue." *Id.* at 905. Accordingly, the facts of *Richmond* and those of the present case should be compared before concluding how *Richmond* controls.

motion. The Court has granted the motion by marginal order. Because the Court concludes as a matter of law that separate corporations must calculate their taxes separately, regard-

less of how they are run, the Court has not relied on evidence presented by either side on this matter.

While there are similarities in the *Richmond* case and the present case, there are also clear differences. It is true that both television and nursing home operations are heavily regulated and require a license. There is "no certainty," however, that a television station seeking a license will ever go on the air, because the FCC must choose among competitors. At the time Colton and Charles sought nursing home licenses they were generally assured of getting the licenses if certain objective requirements were met; there was no competition.[2]

There are also some distinctions in the nature of the expenses in question. In *Richmond*, the expenses were for training and for obtaining a television broadcasting license. *Id.* at 904. There was no finding that these expenses were similar to those that would be incurred week in and week out, as there has been in this case. Further, the expenses were incurred over several years, *id.* at 904, unlike the present case where the expenses were incurred in the same tax year as the issuance of the license.[3]

*Richmond* was the only case cited by counsel on this point. After an extensive search the Court has found a number of Tax Court cases dealing with the question of when a business begins for the purpose of deductions of business expenses.

A recent case involved certain start-up costs of a nuclear power plant. In *Madison Gas & Electric Company v. Commissioner*, 72 T.C. 521, 1979 CCH Tax Court Reporter 3514 (June 21, 1979), the Tax Court first found that the nuclear power plant was operated by a partnership of several utility companies, and was not simply an expansion by the taxpayer. 1979 CCH Tax Court Reporter at 3543. Thus the question was whether this new organization could deduct certain start-up costs under § 162(a).

The expenses were incurred in 1969 and 1970, after a provisional construction permit was issued in 1968, but before the operating license was issued in 1973. The provisional construction permit was issued upon a finding that "the proposed facility was similar in design to plants previously approved by the NRC [Nuclear Regulatory Commission] and that there was a reasonable assurance that the proposed facility could be constructed and operated at the proposed site without undue risk to the health and safety of the public." *Id.* at 3527. The Tax Court found that, as of March, 1978, the NRC had "never denied an operating license upon completion of a facility under the authority of the provisional construction permit." *Id.*

Nonetheless, the Tax Court found that the expenses were not deductible. Relying primarily on *Richmond, supra,* the court stated: "When business operations commence is a fact question to be decided under the facts and circumstances of a given case, but in this instance we find that the facts are not distinguishable from those in *Richmond* and we conclude that *Richmond* was rightly decided." *Id.* at 3545.

The expenses involved related to training, developing internal procedures, hiring, nuclear fuel management, environmental activities, and purchase of spare parts. *Id.* at 3528. While most of these expenses would be recurring expenses, it is not clear from the opinion which of them would produce value only in the taxable year, and which would produce more lasting value. *Id.* at 3529–3532.

In another Tax Court case, the taxpayer tried to deduct the following expenses incurred before his drug store opened its doors for business: a three month supply of prescription labels, a burglar alarm mainte-

---

**2.** The IRS minimizes the relevance of the certainty of obtaining the license by stating that in *Richmond* the two most serious applicants for the license entered into an agreement which virtually assured the taxpayer the license, yet the court disallowed deductions for the period between the agreement. *Richmond* at 903–904. That is not a completely accurate characterization of the facts in *Richmond*, however, since

the court termed the entire prelicense period as a "doubtful, prefatory stage." *Id.* at 905.

**3.** The *Richmond* court did not really consider the time factor, basing its ruling primarily on the conclusion that *all* expenses incurred before the license was received must be capital. *Id.* at 908.

nance fee, purchase of hardware, purchase of a prescription-numbering machine, various license fees, payment for telephone and installation, purchase of a cash register, attorney's fee for incorporation, first and last months' rent on the building, and purchase of a typewriter, a refrigerator, a vacuum cleaner, and sundry office supplies. *Kennedy v. Commissioner*, T.C. Memo 1973–15, 32 CCH Tax Ct. Memo 52 (1973). All of these expenses were incurred during the tax year in which the business opened. The Tax Court reached the following conclusion, citing *Richmond, supra*:

> Riverside did not begin to function as a going concern until the date it first opened its doors to the public—September 12, 1969. Albeit Mr. Kennedy was legally capable of filling prescriptions at an earlier date because of having acquired the requisite licenses, the ability to transact business does not satisfy the "carrying on" requirement of the statute. Therefore, we hold that none of the pharmacy-related expenditures made prior to opening on September 12, 1969, is deductible by petitioners under Section 162(a).

> Mr. Kennedy's preopening expenditures were incurred in creating a business which would ultimately produce income taxable to Riverside after incorporation. These expenditures, therefore, should be treated as contributions to the capital of Riverside and reflected in the basis of the corporation's stock owned by Mr. Kennedy.

*Id.* The court apparently drew no distinction between expenses which produced a benefit in the same taxable year, and those which did not.

Such a distinction does appear to have been made in *Francis v. Commissioner*, T.C. Memo 1977–170, 36 CCH Tax Ct. Memo 704 (1977). In that case expenses deducted on 1972 and 1973 tax returns were called into question. The expenses, attributable to a new apartment project, included the following: taxes, insurance, legal and professional fees, maps and officer supplies, auto expenses, books and periodicals, business travel, professional societies, recording fees, rental commissions, advertising, stenographic expenses, bank charges, and utilities. *Id.* at 706. The Tax Court held that this apartment project was a new business, not an expansion of an existing business. It was found that the petitioner was carrying on a business as of June, 1973—the middle of the second tax year in question. The Tax Court disallowed the 1972 deductions, but went on to make the following comments about the 1973 deductions:

> However, it is clear that by June of 1973, petitioner was in the trade or business of operating a rental apartment complex. The parties have stipulated that by that time the Doral Apartments were completed, occupied and producing income. Consequently, the expenses claimed in 1973 can be distinguished from those claimed in 1972.

> Respondent concedes the deductibility of certain of these expenses, namely the expenditures for interest, advertising and utilities, if it is held that the petitioners were in a trade or business after June 1973. In addition to the expenditures conceded by respondent, we conclude that the amounts paid as rental commissions and maps are deductible as entirely attributable to the operation of a trade or business. The remaining charges or expenses which are in the nature of indirect or overhead expenses should be apportioned. Since petitioner was clearly engaged in a trade or business for seven months of the year of 1973, seven-twelfths of these charges should be allowed as ordinary and necessary business expenses.

*Id.* at 707. While it is not entirely clear from the facts given, it would appear that the Tax Court allowed deductions of *all* direct operating expenses during 1973, whether they were incurred before or after June, 1973, the time at which it was clear that business had begun.

No clear rule applicable to the facts at hand emerges from the above cases. All of the cases demonstrate that the issues of

when a business begins, and when expenses are deductible under § 162(a), are issues to be determined on the facts of each case.[4]

■ Upon the facts of this case, the Court concludes that the expenses in question were allowable deductions and considers the following factors relevant in reaching this conclusion: The corporations were virtually assured receipt of nursing home licenses if certain objective regulatory standards were met so that there was no uncertainty about the business beginning. (This finding is supported by the fact that one license was received within three weeks of application, the other within five.) The expenses in question were all incurred during the tax year in which the nursing homes received their licenses and started to accept patients. All of the expenses were the type incurred in the normal operation of the homes. Finally, all of the expenses produced benefits to the corporations within the same tax year.

The Court notes that at oral argument, the government asserted that there was no basis for considering as a relevant factor when the expenses produced a benefit to the taxpayer. This assertion is not strictly accurate. Numerous cases, including *Richmond,* have applied the rule that "treats an item as either a business expense, fully deductible in the year paid, or a capital expenditure, which is not, *depending upon whether it secures for the taxpayer a business advantage which will be exhausted completely within the tax year.*" *Jack's Cookie Co. v. United States,* 597 F.2d 395,

402 (4th Cir. 1979) (emphasis added), *cert. denied,* 444 U.S. 899, 100 S.Ct. 207, 62 L.Ed.2d 134 (1979); *see also Richmond, supra,* at 907; *Darlington-Hartsville Coca-Cola Bottling Co. v. United States,* 393 F.2d 494, 496 (4th Cir. 1968), *cert. denied,* 393 U.S. 962, 89 S.Ct. 402, 21 L.Ed.2d 376 (1968); *Georator Corporation v. United States,* 485 F.2d 283, 284 (4th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974); *United States v. Wehrli,* 400 F.2d 686, 689 (10th Cir. 1968). It is true that these cases generally involve an on-going business, rather than a new one, but the Court sees no reason why the same rule should not apply to a new business during the tax year in which it begins operations.

Accordingly, it is this 28th day of May, 1980, by the United States District Court for the District of Maryland, ORDERED:

1. That judgment be entered for the defendant, Manor Care, Inc.; and

2. That copies of this Memorandum and Order be sent to counsel for both parties.

---

4. This is true in a variety of contexts. Regulations under § 248 (election to amortize organization expenses), for example, provide:

" * * * The determination of the date the corporation begins business presents a question of fact which must be determined in each case in light of all the circumstances of the particular case. * * * Ordinarily, a corporation begins business when it starts the business operations for which it was organized. * * * If the activities of the corporation have advanced to the extent necessary to establish the nature of its business operations, however, it will be deemed to have begun business. For example, the acquisition of operating assets which are necessary to the type of business contemplated may constitute the beginning of business." 26 CFR 1.248–1(a)(3), *quoted in Equitable Life Ins. Co. of Iowa v. Commissioner,* T.C. Memo 1977–299, 36 CCH Tax Ct. Memo 1184, 1188 (1977). A definition offered by Justice Frankfurter also indicates that a question of fact is involved: " ' . . . carrying on any trade or business' . . . involves holding one's self out to others as engaged in the selling of goods or services." *Deputy v. DuPont,* 308 U.S. 488, 499, 60 S.Ct. 363, 369, 84 L.Ed. 416 (1940) (Frankfurter, Jr., concurring).