José Rubert Armstrong et al., Petitioners, *v.* Tax Court of Puerto Rico, Respondent. Sol Luis Descartes, Treasurer of Puerto Rico, Intervener.

No. 283. Argued September 8, 1952.—Decided November 7, 1952.

*Cayetano Coll Cuchí* and *Víctor A. Coll* for petitioners. *Víctor Gutiérrez Franqui, Attorney General,* and *José A. Mayoral, Assistant Attorney General,* for intervener, respondent in the main action.

MR. JUSTICE ORTIZ delivered the opinion of the Court.

On December 23, 1947, by deed of sale and mortgage executed in San Juan, José Rubert Armstrong sold to the Everlasting Development Corporation the joint ownership of an undivided property of 517.5179 cuerdas located in Monacillos Ward of Río Piedras.[1] The property was sold for $64,000, of which the vendor received from the purchaser, the amount of $12,000 immediately. The corporation bound itself to pay the difference of $51,200 in four instalments of $12,800 each on June 30 and December 31, 1948; January 15 and February 15, 1949, with interest at the rate of 2% per annum payable on becoming due the monthly instalments.

As security for the payment, interest, costs and expenses in case of foreclosure, the purchaser constituted a first mortgage on the real property acquired. In the same deed it was agreed that the debtor could substitute this mortgage security for a pledge security in which case the property would be free from any mortgage liens.

Three days later, in a document issued on December 26, 1947, the Everlasting Development Corporation, Mr. Rubert and the Crédito y Ahorro Ponceño Bank executed a deed entitled "Contract of Pledge" in which the Everlasting Development Corporation states that it has constituted a pledge on the amount of $52,421 to secure the principal obligation of $51,200, plus interest, costs, expenses and attorney's fees in case of foreclosure, which amount "the afore-mentioned

---

[1] The same facts herein stated are admitted by stipulation as to the cases of the two other petitioners Guillermo Rubert Armstrong and Pedro Juan Bonnin, especially as to the amounts involved in the three sales of the three joint ownerships, and as to the operations, terms and conditions surrounding the sale.

debtor has deposited in the Crédito y Ahorro Ponceño Bank, San Juan Branch, Mr. Roberto Villanueva having stated, as representative of said bank, that he received said amount under the obligation to keep and withhold it as security for the total payment of the obligation of the Everlasting Development Corporation."

The Crédito y Ahorro Ponceño Bank bound itself in that same document not to restore either wholly or partially the pledge to the debtor corporation unless the total or partial payment, as the case would be, of the obligation contracted by the former with José Angel Rubert were made. In addition, the conditions for the redemption of the pledge and for its foreclosure, in case of nonperformance on the part of the corporation, were agreed upon in the contract.

By deed executed on that same date, the parties agreed to cancel the mortgage previously executed.

In the year 1948, on the maturity date of the deferred payments of the price of the sales contract, the purchaser paid to the petitioners the total amount of both instalments for said year, to wit: the instalment due on June 30, 1948, and the one due on December 31, 1948, by check, in both cases, of the said corporation, drawn against the Crédito y Ahorro Ponceño Bank, which checks were deposited by petitioners in their check account of the National City Bank of New York, San Juan Branch, and duly honored. Likewise, the instalments corresponding to January 15, 1949 and February 15, 1949 were paid.

The interest agreed between the purchaser and the vendors for the deferred instalments were paid to the vendor by the purchaser as stipulated in the contract.

Petitioners reported these payments in their income tax returns for 1948 and 1949 paying thereby the income tax corresponding to the profits accrued during said years.

The Income Tax Bureau of the Department of Finance, upon examining petitioners' income tax returns for the year 1947 determined that the sale of the joint ownership of the

property San Patricio and Puerto Nuevo, in the aforesaid manner, was a cash sale and not on instalments and proceeded to notify a deficiency in petitioners' returns for said year in the amount of $35,089.70, plus interest, in the first case, $34,243.47 in the second and $13,108.35 in the last case.

As determined by the Tax Court each condominium cost petitioners herein $7,727.76, and since each petitioner sold his condominium for $64,000, they each had a total profit of $56,272.24 in the transaction.

As the Tax Court states:

"The controversy arises from the fact that in 1947 each taxpayer reported as income derived from the capital profit had in this transaction only the amount of $11,254.46,[2] computed on the basis of the initial payment in cash of $12,800 in proportion to the selling price and the cost, while the Treasurer contends that they should have included for said year the total profit of $56,272.24 obtained by each one. The deficiencies,[3] without the interest, amount to $35,089.70 for plaintiff José Rubert Armstrong, $13,108.35 for Pedro J. Bonnin and $34,243.47 for Guillermo Rubert Armstrong."

After the evidence was introduced and the questions of law duly considered, the Tax Court rendered a decision dismissing the complaint and consequently sustaining the deficiencies notified by the Treasurer, as before stated, as to each one of petitioners herein.

The reasonings of the decision rendered may be grouped into two different conclusions, the first, "that this is not the case of a genuine instalment or deferred payment sale for the purposes of the provisions of the tax statute and its regulation." In regard to this, the court states the following:

"This conclusion does not imply the least imputation of fraud on the part of the taxpayers. Neither did they conceal the

---

[2] In the petition for certiorari it is admitted, and the Treasurer also assigns it in his brief, that the amount really informed was of $11,071.03. In their returns petitioners availed themselves of the instalments sales method.

[3] The deficiencies vary due to the differences in other incomes of the three petitioners.

taxable income nor did they manipulate to conceal it. They simply believed that they could avail themselves of the provisions which would allow them to apportion the tax on these profits over different years, and for that purpose they intended, by way of a certain modality, to convert a cash sale for all practical purposes into an instalment or deferred payment sale for tax purposes."

The second finding of the Tax Court is in the sense that although a genuine instalment or deferred payments sale should have been effected, the total income received would be likewise taxable in the year 1947, pursuant to § 84 of Income Tax Regulation No. 1 and of paragraph (c) of § 5 of the Income Tax Act (Laws of 1925, p. 400) which provides: "the amount realized from the sale ... of property shall be the sum of any moneys received plus the fair market value of the property (other than money) received." The Tax Court understood that the credit for the deferred payment acquired by petitioners in the sale to the Everlasting in view of the pledge given, (formerly mortgage) had a market value of $51,200 (the amount of money deposited in pledge) which, added to the $12,800 paid in cash made a total value received of $64,000. Therefore, the finding of said court was to the effect that each one of the petitioners realized in the taxable year of 1947 the total capital profit obtained in the sale, which amounted to $56,272.24 and which they ought to have included in their income tax return for said year.

The petitioners in this certiorari filed under the provisions of the organic act of the former Tax Court, assign that in their opinion the trial court committed the following errors:

"a. In holding that the transaction between petitioners and the Everlasting Development Corporation was one expressly done to avoid the payment of taxes for the year 1947 and that said transaction did not constitute the genuine instalment or deferred payment sale contemplated in Regulation No. 1 promulgated by the Treasurer of Puerto Rico in 1924 and § 5 of the Income Tax Act.

"*b*. In erroneously applying §§ 82, 83 and 84 of the aforesaid regulations of the Treasurer of Puerto Rico to transactions of this kind."

██ ██ In their brief the petitioners set forth the following:

"The reason for executing the sale as it was done, and which the Tax Court apparently did not conceive, is obvious. If Messrs. Rubert would have executed the sale in cash, the business would not have been to their advantage inasmuch as the payment of taxes, calculated for a single year, almost totally absorbed the benefits. But in order to carry out the transaction it was imperative that it be made on instalment, as provided by the law and the policy of the Department of Finance set forth in the Regulation. This reason has never been concealed by petitioners, but clearly expressed by Mr. José Rubert when he testified as witness before the Tax Court. Undoubtedly this is a fair and legal motive for carrying out the sale by instalment instead of by cash. . . .

"It is not possible to classify as fraudulent a transaction which consists of public documents and whose validity is not discussed. Petitioner was entitled to sell his property in those conditions which were most favorable to him, including the lesser payment of taxes. What petitioner could not have done was to scheme a fraudulent transaction to avoid the tax; but it is well known, and it would be idle to cite any authorities, that every taxpayer may avail himself of the legal means within his reach to alleviate his tax burden, as long as he does not resort to fiction or unlawful means."

Two basic questions are raised herein in connection with the essential problem of whether the incomes must be considered as totally received in the year 1947 or as apportioned over subsequent years, to wit:

(1) Assuming that petitioners have acted pursuant to the law, whether the fact that their purpose openly admitted by them was that of reducing the payment of taxes, implies the inefficiency of their plan of paying the taxes in different instalments, with the corresponding obligation to pay the tax as if the total income proceeding from the sale would have been received in the year 1947, and

(2) Whether petitioners really acted pursuant to law.

The first problem raised must be examined in the light of the opinion of the United States Supreme Court in *Gregory* v. *Helvering*, 293 U. S. 465. In said case the taxpayer wholly owned all the shares of stock of corporation A, which, in turn, was owner of a thousand shares of corporation B. The taxpayer wished to be personally the owner of said shares in corporation B without corporation A transferring them directly to B by way of dividend subject to taxation. To carry out this purpose, she caused a new corporation C, to be organized in which she was the only shareholder. Three days after the latter was organized, corporation A conveyed the thousand shares to corporation C. Six days later corporation C was dissolved and in the liquidation of its assets the taxpayer personally obtained the one thousand shares. That was the only business transacted and the only activity carried out by corporation C. Section 112 of the Federal Income Tax Act of 1928 provided, in part, that the distribution of stocks in pursuance of a plan of reorganization to a shareholder, was not taxable income, and the same Section provided that a reorganization meant, in part, a transfer by a corporation of its assets to another corporation, if immediately after the transfer the transferer or its stockholders or both had control over the second corporation. The following was stated in the opinion at page 468:

"It is earnestly contended on behalf of the taxpayer that since every element required by the foregoing subdivision (B) is to be found in what was done, a statutory reorganization was effected; and that the motive of the taxpayer thereby to escape payment of a tax will not alter the result or make unlawful what the statute allows. It is quite true that if a reorganization in reality was effected within the meaning of subdivision (B), the ulterior purpose mentioned will be disregarded. The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. *United States* v. *Isham,* 17 Wall. 496, 506; *Superior Oil Co.* v. *Mississippi*, 280 U. S. 390, 395–6; *Jones* v. *Helvering,* 63 App. D. C. 204; 71

F.(2d) 214, 217. But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. . . .

"When subdivision (B) speaks of a transfer of assets by one corporation to another, it means a transfer made 'in pursuance of a plan of reorganization' of corporate business; and not a transfer of assets by one corporation to another in pursuance of a plan having no relation to the business of either, as plainly is the case here. Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner. No doubt, a new and valid corporation was created. But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function. When that limited function had been exercised, it immediately was put to death.

"In these circumstances, the facts speak for themselves and are susceptible of but one interpretation. The whole undertaking, though conducted according to the terms of subdivision (B), was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else. The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose."

In this last case the taxpayer literally complied with the statute, but the United States Supreme Court thwarted her purpose of evading the tax by way of a process of interpretation of the statute, to the effect that the Act implicitly required that the reorganization be made in the genuine pursuance of a plan of reorganization within the ordinary course of busi-

ness. Paul, *Studies in Federal Taxation, Restatement of Tax Avoidance*, p. 129. There was not an economic justification in connection with the taxpayer's business for said reorganization. *Commissioner* v. *Smith*, 136 F. 2d 556, 559. Although it is possible that motive to escape taxation does not affect, by itself, the action, if the methods used are those actually intended by the law, it is not always enough that the letter of the Taxing statute is followed. The decisive thing is whether or not what has been done is the thing which the statute intended, inasmuch as the taxpayer must bring himself within the intent of the statute upon which he relies. *Commissioner* v. *Riggs*, 78 F. 2d 1004, 1005.

In contrast with the holding in the *Gregory* case, in the subsequent case of *Chisholm* v. *Commissioner*, 79 F. 2d 14, certiorari denied in 296 U. S. 641, the taxpayer with four others, owned all the shares of stock in a corporation. For several months, the taxpayer and his brother had been discussing the convenience of forming a partnership to manage their property in common, inasmuch as the brother wished to travel and disliked business. They formed a partnership and for the additional reason of reducing the taxes they transferred to the partnership their shares in the corporation. Subsequently the partnership sold those same shares to another corporation and the taxable income was received by the partnership and not by the taxpayer individually. The partnership continued doing the business for which it was formed and continued buying and selling securities. In the opinion delivered by Justice Learned Hand the *Gregory* case is distinguished and the doctrine that a man's motive to avoid taxation, in itself, will not establish his liability, if the transaction does not do so without it, is reaffirmed. It is stated that the question always is whether the transaction under scrutiny is in fact what it appears to be in form. It is set forth that "We may assume that purpose may be the touchstone, but the purpose which counts is one which defeats or contradicts the apparent transaction, not the purpose to escape taxation

which the apparent, but not the whole, transaction would realize. In . . . the Gregory case . . . the incorporators adopted the usual form for creating business corporations; but their intent, or purpose, was merely to draught the papers, in fact not to create corporations as the court understood that word. That was the purpose which defeated their exemption, not the accompanying purpose to escape taxation; that purpose was legally neutral. Had they really meant to conduct a business by means of the two reorganized companies, they would have escaped whatever other aim they might have had, whether to avoid taxes, or to regenerate the world."

In the *Chisholm* case the partnership was real and enduring, it continued doing business and answered to a standard of utility and convenience for the taxpayer independently of the taxing motive. The *Gregory* case was decided on the ground of the construction of a statute and the *Chisholm* case was decided on the ground of its own special facts. Paul, *op. cit*, p. 142, *et seq.*

In a subsequent case of *Commissioner* v. *Tower*, 327 U. S. 280 (1946), the Supreme Court of the United States set forth the following at page 288:

"Respondent contends that the Tax Court's holding that he is taxable for the profits from the partnership is contrary to a principle long recognized by this Court that 'The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted.' *Gregory* v. *Helvering*, 293 U. S. 465, 469. We do not reject that principle. It would clearly apply, for example, in a situation where a member of a partnership, in order to keep from paying future taxes on partnership profits and in order to get into a lower income tax bracket, sells his interest to a stranger, relinquishing all control of the business. But the situation is different where the taxpayer draws a paper purporting to sell his partnership interest even to a stranger, though actually he continues to control the business to the extent he had before the 'sale' and channels the income to his wife. Then a showing that the arrangement was made for

the express purpose of reducing taxes simply lends further support to the inference that the husband still controls the income from his partnership interest, that no partnership really exists and that earnings are really his and are therefore taxable to him and not to his wife. The arrangement we are here considering was of the type where proof of a motive to reduce income taxes simply lent further strength to the inference drawn by the Tax Court that the wife was not really a partner. See Paul, Selected Studies in Federal Taxation, 2d series, pp. 293–300. To rule otherwise would mean ordering the Tax Court to shut its eyes to the realities of tax avoidance schemes.''

In *Griffiths* v. *Commissioner*, 308 U. S. 355, it was the case of a sale by instalment. It was held that a taxpayer can not escape or postpone the income tax on the profit derived from a sale of his stock by interposing as vendor in the transaction a corporation formed for the purpose and wholly controlled by himself, which, in form, receives from him a conveyance of the shares, transfers them to the purchaser, receives the purchaser's money and agrees to pay it over to the taxpayer in annual instalments. The following was stated at page 357:

"The facts leave little scope for legal explication. Griffiths had a claim for fraud against Lay which, when satisfied, wiped out the loss for which he had received an earlier deduction. Had satisfaction of the claim come to him without any conduit, it would have indisputably been his income. The claim having been recognized by Lay . . . a lawyer's ingenuity devised a technically elegant arrangement whereby an intricate outward appearance was given to the simple sale from Griffiths to Lay and the passage of money from Lay to Griffiths. That was the crux of the business to Griffiths, and that is the crux of the business to us.

"We cannot too often reiterate that 'taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid.' *Corliss* v. *Bowers*, 281 U. S. 376, 378. And it makes no difference that such 'command' may be exercised through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency. Cf.

*Gregory* v. *Helvering,* 293 U. S. 465. 'A given result at the end of a straight path,' this Court said in *Minnesota Tea Co.* v. *Helvering,* 302 U. S. 609, 613, 'is not made a different result because reached by following a devious path.' Legislative words are not inert, and derive vitality from the obvious purposes at which they are aimed, particularly in the provisions of a tax law like those governing installment sales in § 44 of the Revenue Act of 1932. Taxes cannot be escaped 'by anticipatory arrangements and contracts however skillfully devised . . . by which the fruits are attributed to a different tree from that on which they grew.' *Lucas* v. *Earl,* 281 U. S. 111, 115. What Lay gave, Griffiths in reality got, and on that he must be taxed."

The courts and the authors have been preoccupied with the ethical problem arising from the situation of a taxpayer who alleges he has complied with the law and that, therefore, his legal actions must be protected even though he has acted for the purpose of avoiding or postponing taxation. *Du Pont* v. *Commissioner,* 118 F. 2d 544. It is stated that the judges must be objective as regards this problem, without deciding on the ground of emotional prejudices or abstract principles of morality. Paul, *op. cit.,* pp. 74, 80. However judicial objectiveness does not imply unconsciousness nor isolation as to extraneous realities. Legal neutrality does not mean incapability to react as to the fundamental principle of equity which should rule, not only in human relationships, but also in the relationship between the citizens and their government. The judge must be objective, not amoral. With regard to this problem of evasion of taxes, the fact that there be an underlying motive does not justify in itself the levying of taxes, but it does justify that the transaction be lawfully scrutinized and the taxpayer must assume the burden of introducing the evidence incumbent on him, in order to show that he has strictly complied with the statute. *Morsman* v. *Commissioner,* 90 F. 2d 18, 22; *Continental Oil Co.* v. *Jones,* 113 F. 2d 557, 761; *Niles* v. *Milbourne,* 100 F. 2d 723, 725; *Helvering* v. *Minnesota Tea Co.,* 89 F. 2d 711, 713. Such transactions must be strictly scrutinized and zealously

construed. Paul, *op. cit.*, p. 107; *Tazewell Electric Light & Power Co.* v. *Strother*, 84 F. 2d 327. In *Morsman* v. *Commissioner*, *supra*, the court stated (p. 22) :

"When a taxpayer thus boldly proclaims that his intent, at least in part, in attempting to create a trust is to evade taxes, the court should examine the forms used by him for the accomplishment of his purpose with particular care; and, if his ingenuity fails at any point, the court should not lend him its aid by resolving doubts in his favor."

 Let us consider the attendant circumstances in the light of the law and of the corresponding statute. Our Income Tax Act was approved on August 16, 1925, retroactively to January 1, 1924, and said Act No. 74 of 1925 follows mostly, literally or substantially the language of its prototype, the Federal Income Tax Act of 1924. *Behn* v. *Domenech, Treas.*, 49 P.R.R. 790, 792. Section 5(*c*) of our Act provides as follows:

"The amount realized from the sale or other disposition of property shall be the sum of any moneys received plus the fair market value of the property (other than money) received."[4]

Our § 5(*e*) provides as follows:

"Nothing in this section shall be construed to prevent (in the case of property sold under contract providing for payment in installments) the taxation of that portion of any installment payment representing gain or profit in the year in which such payment is received."[5]

---

[4] This Section literally corresponds to § 202(*c*) of the Federal Act. This provision was re-enacted in the Federal Act of 1926, which is relevant to the discussion herein, as we shall see hereafter.

[5] This Section corresponds to § 202(*f*) of the Federal Act of 1921, which corresponds to § 202(*e*) of the Federal Act of 1924. Prior to the year 1921 there was no such provision in the Federal Act. Possibly due to this provision it was that the Board of Tax Appeals decided that the part of the Federal Regulation, approved prior to 1921 which determined the proceeding to be followed in cases of instalment sales, was not authorized by the law. See *Appeal of B. B. Todd*, 1 B.T.A. 762. Section 212(*d*) of the Federal Act of 1926, which we shall discuss hereinafter was approved with the purpose of clearing the situation created by said decision of the Board. Seidman, *Legislative History of Federal Income Tax Laws*, p. 590; Mertens, *Law of Federal Income Taxation*, Vol. 2, p. 448, § 15.02; *Hoover-Bond Co.* v. *Denman*, 59 F. 2d 909; Magill, *Taxable Income*, p. 213, revised edition; 34 Ill. L. Rev. 599.

Sections 82, 83 and 84 of Regulation No. 1 of the Treasurer to implement Act No. 74 of 1925 (Sess. Laws, p. 400), provides as follows:

"Section 82.—*Sale of real property involving deferred payments.*

"Deferred payment sales of real property fall into two classes when considered with respect to the terms of sale, as follows:

"(1) Sales of property on the instalment plan, in which the initial payment is relatively small (generally less than a fourth of the selling price) and the deferred payments are usually small and of reduced amounts. These include (*a*) sales in which there is an immediate transfer of title, the vendor being protected by a mortgage or other lien as to deferred payments, and (*b*) agreements of purchase and sale which contemplate that a conveyance is not to be made at the outset, but only after all or a substantial portion of the selling price has been paid.

"(2) Deferred payment sales not on the instalment plan, in which there is a substantial initial payment (ordinarily not less than a fourth of the selling price) the deferred payment being secured by way of a mortgage or any other lien. Such sales are distinguished from the instalment sales because the initial payment is large and also, usually, because the number of deferred payments is relatively small.

"In determining how to deal with this kind of sales when levying an income tax, the question in each case is whether the income to be reported for tax purposes, should be based solely on the amounts actually received in the taxable year, or on the consideration fixed in the contracts for future payments.

"Section 83.—*Sale of Real Property on Instalment Plan.*

"In the two kinds of transactions included in class (1) in the preceding Section, instalment obligations assumed by the purchaser must not be ordinarily regarded as having a fair market value, and the vendor may return as income from such transactions in any taxable year that proportion of the instalment payments actually received in that year which the gross income to be realized when the property is paid for bears to the total contract price. If the purchaser defaults in any of his payments, and the vendor returning income on the instalment basis reacquires the property sold, retaining the previous payments, the

entire amount of such payments less the profit previously obtained, shall be income for the vendor and it shall be reported in the return for the year in which he reacquired the property, and the latter should be included in the inventory at the original cost of the vendor (less any depreciation as defined in §§ 128 and 129). If the taxpayer chooses as a matter of consistent practice to treat the obligations of the purchaser as having a fair market value and return the income derived from the whole transaction as payment in cash and on instalment, as income for the year in which the sale was made, such a course is permissible. If they are so treated, the rule set forth in § 84 will be applicable.

"Section 84.—*Deferred-payment sales of real property not on instalment plan.*

"In transactions included in class (2) of § 82 the obligations assumed by the purchaser are better secured because of the margin afforded by the substantial initial payment, and experience shows, that the majority of such sales are eventually fulfilled pursuant to their conditions. If these obligations have a fair market value they must be considered as the equivalent of cash and the property obtained from the transaction is taxable income for the year in which the initial payment was made and the obligation was received by the vendor. If the purchaser defaults in any of his payments and the vendor again obtains the title to the property by way of a contract or by law, retaining the payment previously made, he may deduct from his gross income as a loss for the year of repossession, any excess of the amount previously reported as income over the amount actually received, and he must include such real property in his inventory at the original cost (except for any depreciation as defined in §§ 128 and 129). If the obligations have no fair market value, the amount of initial payment shall be applied against and reduce the basis, pursuant to § 7 and § 32–44, of the property sold, and if in excess of such basis, shall be taxable to the extent of the excess. Gain or loss is realized when the obligations are disposed of or satisfied the amount being the difference between the basis, as provided above, and the amount realized therefor. See §§ 32 and 125."

Petitioners herein kept their books on a "cash basis." *Cf. Buscaglia, Treas.* v. *Tax Court*, 65 P.R.R. 331, 332. Independently of the afore-cited provisions referring to instal-

ment sales, the income of a taxpayer who avails himself of said method is taxable irrespective of whether it is not money in cash. It is considered as taxable income in the year in which the taxpayer has the absolute power to obtain cash, although he has not actually done so. Magill, *Taxable Income*, revised edition, p. 179; 39 Harv. L. Rev. 82, 83; *Loose* v. *United States*, 4 F. Supp. 375, affirmed in 74 F. 2d 147. It is also taxable income if it is the equivalent of cash, that is if the income is represented by any property received instead of cash which has a fair market value, as provided, as to sales, by the afore-cited § 5(c) of our Income Tax Act. Any obligation that gives rise to a right, which has a fair market value, must be considered as taxable income irrespective of whether the books are kept "on a cash basis" and said indebtedness has a fair market value when no contingencies or speculations exist or it does not depend on uncertain facts, especially when it is unconditional and subject to minimum risks. 2 Mertens, *Law of Federal Income Taxation*, §§ 11.01 to 11.04, pp. 34–41, 49, and cases there cited. Incidentally see *Burnet* v. *Logan*, 283 U. S. 404 and *Helvering* v. *Bruun*, 309 U. S. 461, 469, where it is stated that a taxable income derived from a sale does not have to be in cash. See also 2 Mertens 191. The fair market value is the function of the reasonable adaptability of the property to be sold. *Cf.* 18 Cornell Law Quarterly, 564, 568. These principles are applicable to an instalment sale, the transaction being considered as one by deferred payments. 2 Mertens 41 *et seq.*, § 11.05.

The general rule, in the absence of any provision of a statute or regulation to the contrary, is to the effect that the doctrine of the "equivalent of cash" is to be applied to an instalment sale, that is, generally, when the purchase price is represented by cash and by property which is the equivalent of cash, the full gain must be recognized in the taxable year in which the property is sold or disposed of. 2 Mertens 41, § 11.05. The statute has, however, carved out certain

exceptions providing an option for the taxpayer in order that he may dispose of his property on the instalment plan so that his income be distributed in different years, paying a tax each year in which an instalment payment is actually received. 2 Mertens 41, 42. As alleged by the taxpayer, those exceptions are contained in the afore-cited provisions of § 5 (e) of our Act and §§ 82, 83, and 84 of Regulation No. 1 which we shall pass on to examine in connection with the facts herein. At the outset, we should point out that even though the instalment sales provisions are relief provisions and exceptions to the general rule, as to recognition of gain, as such they must be strictly construed against a taxpayer moreover if said method is used as a means to evade taxes. 2 Mertens 447; *Blum's Inc.*, 17 B.T.A. 386.

The afore-cited § 5 (e) implicitly recognizes the method of reporting incomes on the instalment basis but does not define the form and manner in which said method may be used. Seidman, *Legislative History of Federal Income Tax Laws*, p. 590. Said definition is formulated by §§ 82, 83, and 84 of Regulation No. 1 of the Treasurer.

As we have seen, § 82 of the Regulation defines what constitutes an instalment sale: (1) when the initial payment is small, *"generally* less than a fourth of the selling price,"* including sales in which the vendor is protected by a mortgage or other lien as to deferred payment, and said transaction is distinguished from (2) a deferred payment sale, in which the initial payment is substantial *"ordinarily* not less than a fourth of the selling price," the deferred payments being secured by way of a mortgage or any other lien. (Italics ours.)

Section 83 provides that in the case of instalment sales, when generally the initial payment is less than one fourth of the total price, the obligations assumed by the purchaser as to the payment of instalments must not be *ordinarily* regarded as having a fair market value, and the vendor may report his income in the different years he receives the payment of the instalments.

Section 84 provides that, in case of deferred payments, when the vendor ordinarily receives an initial payment of more than a fourth of the total price, the vendor is better secured due to the substantial first payment, and it is provided that in said case, if the obligations have a fair market value, they must be considered as the equivalent of cash and the tax on the total profit must be levied in the year when the initial payment was made.

Said provisions of the Regulation are not mandatory, rigid or categoric. They are merely directory. They establish a margin of flexibility when they indicate that they may not be applied to ordinary or general situations. This generality permits the application of different standards in a case where circumstances are not ordinary.

In *Ralston Steel Car Co.* v. *Commissioner of Internal Rev.*, 53 F. 2d 948, 950, it is held that the use of the word "ordinarily" in an income tax regulation indicates flexibility of application rather than an undeviating practice. *Cf. Stine* v. *Union Electric Co. of Illinois*, 26 N. E. 2d 433, 435, where it is stated that "ordinarily" does not mean "actually," and hence, that in using said word in a statute it implies that the statutory requirements need not be actually and exactly complied with. "Ordinarily" means "usually." *St. Louis Southwestern Ry. Co. of Texas* v. *Morrow*, 93 S. W. 162.

Precisely the regulation can not establish rigid and inflexible categories as to instalment or deferred payment sales, on the basis of a specific percentage of the total selling price as a border line or demarcation which may give rise to different legal consequences. Section 5 (*e*) of our Act allows, in general terms the instalment sales method, but it does not specify nor defines different kinds of situations. *Cf.* as to the validity of regulations, *Descartes, Treas.* v. *Tax Court and Sucn. Serrallés*, 71 P.R.R. 440, 445.[6]

---

[6] The Federal Act is categoric and specific as to this point. In 1926, § 212 (*d*) was approved and it provided that in the case of sales of personal property, if the initial payment does not exceed one-fourth of the purchase

As a matter of fact the obligation of the purchaser in the case at bar to pay the price on different instalments had a fair market value. This obligation was secured by a pledge on the total amount owed, which had been deposited in a bank as a pledge security The purchaser could not withdraw said money from the bank. The vendors had the absolute right to receive the amount of the instalments on the dates previously agreed upon or in case they failed to pay, to resort to the money deposited in the bank. The obligation was not contingent nor speculative nor depended on uncertain facts. The vendors were fully guaranteed and they did not run any risks whatsoever as to the payment of the instalments. Actually, they controlled the payment of the instalments. They could legally grant or sell their credit or right to the payments jointly with the accessory right represented by the pledge. Sections 1065 and 1418 of the Civil Code; *Carlo* v. *Vargas*, 66 P.R.R. 387; *Caguas Company Inc.* v. *López*, 59 P.R.R. 263; *Seín* v. *González et al.*, 26 P.R.R. 610. It is true that the rate of interest of 2%, was low but that was due to the almost absolute certainty of the payment of the credit.

---

price, the taxpayer may avail himself of the instalment sales. The following is expressly set forth:

"As used in this subdivision the term 'initial payments' means the payments received in cash or property other than evidences of indebtedness of the purchaser . . ."

It has been construed as directory, and any sale in which the initial payment be less than the percentage fixed by law is covered by the instalment-sales method. 2 Mertens 474 *et seq*. It must be observed as to the express conclusion of "evidence of indebtedness" as part of the price, that before said amendment was approved in 1926, the Board of Tax Appeals had decided that notes to the purchaser in a sale should be considered as equivalent of cash. *Appeal of H. J. Kelly*, 3 B.T.A. 257. Naturally, after the 1926 amendment the rule was different. *Estate of Plumer* v. *Commissioner*, 10 B.T.A. 1055, 1061–1062; *Brown & Coke Co.* v. *Commissioner*, 14 B.T.A. 609, 614. Said Section of the Federal Act is not in force in Puerto Rico. At any rate, even under the Federal Act, notes or mortgages of a third party, and not of the purchaser, are considered as equivalent of cash inasmuch as they have a market value, and should be considered as part of the initial payment for the purposes of the statutory percentage, giving origin to a transaction of deferred payments, in which the tax is reported in the year of sale and not to an instalment sale, in which the taxes are distributed. 2 Mertens 43, 478; *Caldwell* v. *United States*, 114 F. 2d 995.

Although under § 83 of the Regulation, the obligations of a purchaser who makes an initial payment of less than a fourth of the total price, must not be ordinarily regarded as having a fair market value, the attendant circumstances are so powerful as to security and absence of risks involved in the collection of the debt, that we must arrive at the conclusion that this is not an ordinary case and that the obligation of the buyer had a fair market value and being therefore equivalent of cash, it must be computed as part of the initial payment in the light of the provisions of § 5(c) of our Act.[7]

It could be alleged that § 83 of the Regulation, in providing that ordinarily the obligations of the buyer do not have a fair market value, establishes a presumption in that sense. Independently of any question connected with the power of the Treasurer to establish presumptions in the Regulation, the burden of proof falls on the taxpayers to avoid the payment of taxes in a single year, since, as we have seen, they acted for the sole purpose of avoiding or postponing taxation. This is not an "ordinary" case which involves a "general" situation. This is an exceptional case in which an instalment-sale plan was effected for the sole purpose of paying less taxes. As we have already stated, the taxpayers must show that they have strictly complied with the statute.

Even prior to the Federal Act of 1926 (see n. 6) the federal regulations established the distinction between the two different situations involved herein on the basis of the amount of initial payment. As it is stated in 2 Mertens 450 "The reason for setting up a distinction between a sale in which there was a large initial payment and one in which there was no such initial payment is made clear by these regulations. Where the initial payment was rather large it

---

[7] Section 5(c) provides that the amount realized from the sale shall be the sum of any moneys received plus the fair market value of the property (other than money) received. The other provisions connected with instalment sales must be construed jointly with § 5(c), which must be applied in transactions which fail to qualify under the specific instalment provisions of the Regulation. 34 Illinois L. Rev. 597, 601; 2 Mertens 452.

was felt that the obligations issued by the buyer were much better secured because of the margin afforded by the substantial first payment. The obligations thus received, *could* therefore be regarded as the equivalent of cash. Experience showed, however, that where initial payments were small, the obligations were less secure and *ordinarily* could not be regarded as the equivalent of cash." (Italics ours.)

What the regulation established was a general and flexible rule on the basis of usual experience. However, in specific cases, as here, in which the obligations of the purchaser were completely guaranteed, and in which the safety margin of the vendor was almost absolute, that rule which corresponds to the reality involved in that specific case, must be applied, inasmuch as it corresponds to the purpose involved in the provision. Although experience would show that, generally, there is not an adequate margin of safety when the initial payment is small, however, if contrary to that prior experience in a specific case, there exists a margin of complete safety, although the initial payment be small, then the obligations of the purchaser must be considered as the equivalent of cash. As we have seen, the regulation does not exact, in a mandatory way, that in all cases in which there is an initial payment of less than a fourth of the selling price, the transaction must be deemed as an instalment sale. The flexibility expressed in the regulation is compatible with the possibility that a contingency may arise where the general rule set forth in said provisions may not be applied, especially in those cases where the safety margin of the vendor be almost invulnerable.

Although not exactly applicable to the attendant circumstances here, in the opinion delivered by the United States Supreme Court in *Higgins* v. *Smith*, 308 U. S. 473, 477, it is stated in part as follows:

"... the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing

business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation."

The judgment appealed from will be affirmed.